We need 471277, 1278, and 1308. Decisioning.com v. Ameritrade Contractors, TD Ameritrade, and OHSBC-5, SBC-5. Terra Nova. Good morning, your honors. May it please the court, My name is Steve Terra Nova, and I'm on behalf of AppellateDecisioning.com, and we're here to contest the granting of summary judgment on infringement by the district court in favor of better department stores, and the other appellates as well. Summary judgment was granted based on a construction to claim terms.  Decisioning.com also contests the construction for the third claim term, which is comparing, and we will address each of these. Further, the appellees also contest a claim term whether or not approved that Decisioning.com v. the district court's construction should be upheld. So what we'd like to do is turn to the remote interface first. We agree with the district court's construction to the extent that the remote interface is computer equipment. However, the district court erred in requiring that equipment to be dedicated. The district court defined dedicated as computer equipment that must be supplied by the entity providing the financial account or service, but it should simply be construed as computer equipment that provides user interface. The operation of the remote interface in patent specification and invention and the processing system are not affected in any way by who supplies the equipment. The remote interface interacts with the applicant and the processing system in the same way, regardless of who supplies the equipment. Mr. Taranoff. Yes, sir. If I could interrupt you and ask you this. There are several patents in this patent family, and the 007 patent and the 811 patent are more akin to each other than to the 721 patent, they're all related. The 721 patent clearly discloses a separate computer and modem, and at some place, I believe, describes that as an alternative embodiment. But I noticed that in that patent, the computer and the modem are in addition to the kiosk. In other words, that block diagram shown in Figure 1 of the 721 patent has both the kiosk with the computer and the computer 34. I'm a little confused as to whether it's an alternative, whether it's in addition to, or how that works, and to some extent, that confuses my view of the 007 patent. Can you remind me a little bit? Sure, absolutely. The 205 application had human-assisted embodiments, embodiments that were required to have further processing or human assistance to determine whether the applicant could be fully approved. And the personal computer stand-alone is in one of those examples. It also has non-human-assisted embodiments, where there is no human assistance as part of the decision to determine whether the applicant can be fully approved. So both of those embodiments, those distinguishments, are in the original 205 application, the 1993 application, and so the kiosk is just a housing. The application describes it as a housing, so it's nothing more than a housing with equipment, and the equipment can be personal computer equipment. It describes the fact that you can have personal computer equipment in a human-assisted embodiment, or you can have non-human-assisted embodiments, and the preferred embodiment of the non-human-assisted was a housing that would contain that equipment. But they operate the same, regardless of whether that housing is there or not. All of the parties agreed that the housing was not a required limitation of this construction, and so the interface equipment is simply just the equipment, and then that embodiment has to be the housing. And so what happened was, is by the time before the 94 application, 653, which led to the 811, the 07, before it got filed, two office actions had been received in the 205 application, rejecting claims unless they had no human assistance to determine whether to approve. So that's why the non-human-assisted embodiment of the kiosk, the example, was carried over to the 653 application, because it was clear that the other examples would not be patentable, and so it was just intended to focus on the best mode of the non-human-assisted embodiment, but was never intended to limit it to a housing. We believe that all the parties agree to that, and if you don't limit the construction to a housing, one ordinary skill in the art would recognize that the equipment performs the same, whether it's in this housing or not, and that's why we don't believe there's a disclaimer. That's very helpful. With respect to the 007 patent, the kiosk had been clearly described throughout the specification as having a computer and a monitor, and it seemed to me that the district court, when it construed remote interface, was having difficulty with whether that should be limited to a kiosk or not, and one gets the sense, reading between the lines, I don't know whether this is fair or not, but just for purposes of discussion, one gets the sense that the district court wanted to construe remote interface as a kiosk, but couldn't do that in light of the amendment that was made in which the word kiosk was specifically deleted and replaced with remote interface, and in a way, it almost seems like the construction that was put in place is a kiosk by another word, by another phrase. It's dedicated and provided by the loan provider. It's another way of saying kiosk. Well, I think you're on to the conundrum here, and I think that the district court, clearly the kiosk is just a housing. It's defined as just a housing specification. It's a preferred embodiment. Certainly the kiosk is disclosed as having a computer. It has a computer screen. One ordinary skill in the art would recognize that the housing absolutely has nothing to do with the essence of this invention, whether it's in a housing or it's not. It was just an example of the non-human assistant embodiment in the 93 application that was carried over because of the real essence of the invention, which is determining whether or not it approves human assistance. You're right. One ordinary skill in the art would recognize that that's just general interface equipment. The specification says user interface. In the beginning of the specification, the first paragraph of the summary, there's no mention of a kiosk. It just says that you have equipment to allow the applicant to interact with the data processing system. So while the kiosk is used prominently in the specification, it's absolutely clear it's a preferred embodiment. The district court and the appellees recognize that it was just a preferred embodiment, and the district court made up this dedicated and supply limitation that is not in the intrinsic evidence. There's one way... You're arguing that the kiosk contains lots of things, and we chose to claim only the interface in claim one. We didn't have to claim any other pieces necessarily, any more than we have to claim the box that it was in, et cetera. I say that's very, very accurate, and I would go further to say that the interface equipment is distinct from the housing set forth in the initial claim. The 94 is two distinct elements. And so all we're doing is amending the claim to go back to the full scope of the invention that was taught to one of the lawyers. As I understand it, the district court, it seems to put three limitations, if you will, that you complain about on the remote interface. Qualifications on the remote interface limitations said, number one, it has to be dedicated, just directed to obtaining the account. Number two, it has to be provided by the institution who would furnish the account or the card. And number three, it can't be a personal home computer. It can't be someone with their laptop at home. Those are the three. They're interrelated. She defined the word dedicated in her construction. She says dedicated computer equipment, meaning equipment supply. It's a dedicated supply. She's interpreting synonymously. And then the PC, like I said, in the court is. Just because we carried over the non-human-assisted embodiment doesn't mean we discipline a PC. But you're right. The computer equipment, and the district court recognized that's just standard personal computer equipment. And the housing doesn't affect the operation's invention. All the parties agreed that the housing's for an embodiment. It's not limited. All we're left with is the interface equipment. But isn't there some support? I mean, it does seem, if you look at the spec, that the intent was that there be something at the location in a mall or a bank. I think there's a reference in the specification of a jewelry store. So what if one were to take a position, okay, it can be, it doesn't have to be dedicated. But it has to be in a mall. And it can be supplied by anyone. But it can't be a remote home computer. I would say that the language of the computer. Would that be even part of what you want? Well, the language you're referring to is permissive. It says it may, a kiosk may be established at a convenient location. Clearly, that's the preferred embodiment. The appellant was in the business of making this equipment. And their preferred embodiment, and therefore their best mode, had to be this kiosk housing. But there is nothing in the specification, in my opinion, that rises to the level of disavowal, disclaim, or anything that would encompass the whole scope of the invention. Where would we be if one concludes, as a matter of claim construction, that you can't have a remote computer in the sense of a home computer, but you can have a situation that the claim does cover a situation where any institution provides the computer, and it can do more than just try and obtain an account. Well, I think that the summary judgment would probably be upheld against us because almost all of the systems of the accused infringing devices have generic interface equipment that happens to be a PC. It has a housing. It just happens to be a home, and it's not supplied. The upheld is against all of them. That's correct. There may be one defendant, one appellee, that does provide some in-store systems that may not be dismissed based on this issue alone, but the majority of it would. But again, there's nothing in the specification. I mean, yes, the best mode is providing housing. The best mode is providing convenient locations. But there's nothing in the specification, I would contend, that rises to the level of anything that would rise that to the level of being the whole scope of the invention or constitute a disavowal or disclaimer. So what you're talking about here is you're talking about a preferred embodiment, which one ordinary skill we are, especially using terms like user interface and computer equipment, was certainly recognized that that housing has nothing to do with the operation of the processing system and the interaction that goes on regarding the true essence of the invention and what's in the prosecution history as the decisioning about determining whether you can be fully approved without human intervention. Do you want to touch on any of your other arguments? Yes, sir. We believe verifying the applicant's identity is erroneous. The district court properly construed that term as to confirm a substantial identity, and that was what the prosecution history of the 007 patent reexam discussed because the prior art just identified the applicant. I'm Judge Mayer, so take my word for it, as opposed to our invention, which takes that information but then goes and verifies it by checking various databases and so forth. That's one of the steps of the invention. The district court, and we were kind of amazed, befuddled a little bit, but the district court went on to enumerate a list of specific data or information types that are required. She said it does not exclude name, address, and social security number plus some additional information. It's less likely to have been improperly obtained. There's nothing in specification that disclaims or disavows or limits any particular type of information to be used to verify an applicant's identity. You can verify an applicant's identity with a credit report. A credit report contains more than a credit score. It contains your name, your address, social security number. If I get your name, address, social security number, I can compare it against a credit report, and that would give me a little more comfort that fraud could be prevented. It might be more unlikely that somebody could get that information than it is likely. We didn't interpret that as an inclusionary requirement, but when we got to summary judgment, she said those specific types of information were required, and she reasoned it by saying it was a qualitative requirement. I mean, we just don't see that in prosecution history at all. It wasn't even brought up at the Markman hearing in her decision at all. We just believe that's improper. We do believe a confirmed or substantiated identity is correct. The other common term that the appellant is going to bring up is whether or not approved, and we believe that the district court's construction should be upheld there because the district court properly construed that all the steps have to be required to be performed, and if there's additional steps, that doesn't defeat the invention. And there's two cases that the appellants bring up. They're very important, but they're very distinguishable, Dipping Docks and Ormco. In both of those cases, the accused infringing device did not perform all the steps. In Dipping Docks, the claims were required to be beads and beads only because there was a free-flowing requirement of the patent for making ice cream being produced from the beads. The accused device never performed just beads. It always performed beads and some other irregular shape, whereas here, the accused infringing devices always have a path. If you're qualified and you can be approved fully, they always have a path where that will occur without human intervention. They always practice the steps of the claim invention. There's nothing that requires a definitive rejection in these claims. As a matter of fact, specification leaves the door open that if you're not approved, it might be because of a delay. It might be because there's more information that's required. So there's nothing that requires a definitive rejection. The essence of the invention is determining whether you can be fully approved. If you can't, fine. If you cannot, you cannot. It doesn't mean that you're definitively rejected for all time and eternity. The district court recognized that in her Martin ruling, and we believe that that's correct. And again, in the Warnco case, the accused device always had a skilled operator determining the final teeth position, whereas the patent required it to be automated. So there was never a path in the accused infringing devices that practiced all the steps of the invention, whereas in our case, all of the accused devices perform the steps of the invention, and if they're not approved, then they're not approved. It just means they couldn't be fully approved. That's the essence of the prosecution history. Would you like to say anything else? I would. Thank you. Thank you, Your Honor. Please report. I am Iris Sulfan for the Federal Department of Stores, now Macy's, Inc., and really an independent appellee in that case. The first issue I'd like to address has to do with the fact that TCI never argued that the, you know, because of paint construction, summary judgment should be overturned in their opening brief. They came back in their reply brief and made an argument that if they get the clean construction for a remote interface they want, of course there's infringement. The problem they've run into in that case is the all-elements rule. What they were arguing is that if there is an element of the claim, the remote interface, which is provided by a party other than the defendants here, then there's still infringement. But in the all-elements rule, lacking that element of the remote interface provided by the defendant, then there's no infringement. So even if they get a clean construction as broad as computer equipment, in this case since the Federal Department of Stores never provides that computer equipment, there's no infringement under the all-elements rule. Federated customers always work from their own computers, is that correct? Or online. Or at an internet cafe or other offices, but not at a federated department store. Or a mall or something like that. If they go to the Apple store. Some public computer, but not a federated department store. You can't go into a Macy's and walk up to a computer and apply for a credit card there yourself. You'd have to do it through a cashier. Where would we be in terms of federated if one were to conclude that a remote interface excludes someone working at home from their personal computer? But it includes someone in a mall working on a computer other than provided by federated and a computer that can do other things than just seek to obtain an account. Well, I'm not sure what computer that would be. If it excludes an applicant's own personal computer, then most of the applications processed by federated over the internet come from those computers. Say some bank or some entity has a computer in a public place in a mall, whether it's a kiosk or on a counter. Right. That computer would not be provided by federated department stores. Under the all-elements rule, federated department stores isn't providing an element of an infringing system. It is not an infringer. So if you read the claim that broadly, we contend the specification doesn't cover or disclose anything that could support a broad reading of the claim, then federated is still not an infringer because it's not providing all the elements. One more question. How is the federated system accessed? People can get online from their own computers, correct? Correct. Macy's.com. And what other ways? It can also be accessed from point of sale. If someone walks up to a cashier and says, I'd like to buy these towels or whatever, the customer is offering this and says, I'd like to open a Macy's account today. And then the cashier would have the information. That's not an infringement in this case. You can also mail an application. Some people still do that. You can also call an application, which is sometimes done. People don't want to give up. They're not comfortable with the security of the internet. They want to provide some information on the internet. You can dial the application. What method is accused of infringing here? Only the internet applications. As far as I know, only from an applicant's own computer. From an applicant's own home computer. Correct. The oil and gas issue that you mentioned earlier was not considered by the district court trial? No. In the summary judgment, that's before us. No. It was not considered because we had a claim construction, which excluded that automatically by the claim construction. So it wasn't addressed by the district court. In the district court's claim construction, as I said earlier, it's obvious that she concluded that the remote interface shouldn't be construed as a kiosk and probably influenced by the amendment that was filed. But it seems to me that that's, in effect, what she tried to do. Why am I wrong in that assumption? I believe that's basically right because that's what the specification discloses. The specification discloses equipment that would be provided by the financial institution. Maybe it's provided by a vendor to the financial institution. So it's true. But that wasn't the claim. Why can't the inventor say, I'm going to disclose a kiosk and it has 15 different things. And I'm just going to claim in my broadest claim that one of those things. And then I'll claim wherein that one thing is in a kiosk. And then by wherein that one thing has something else. Perhaps they could have done that. But that's not what they did. But they had an original application which had different embodiments for the interface. And that was the dedicated equipment that's supplied by the institution. It had the laptop owned by the broker or the agent. They had the personal computer as motive. And they had the telephone interface. And then they said. But whether it's supplied by the institution or not, why is that of any category or of any significance when it seems to me the thrust of all of these patents is the ability to complete certain financial transactions. And in the 007, with this so-called closed loop without human intervention, et cetera. That has nothing to do with who supplied what equipment, where, how, et cetera. It just talks about a computerized loan approval process that can be implemented as claimed. But the claims are recorded in that. It's not just the debit process system that processed the application without human intervention. It also, the claims require a remote interface, which has three functions. To receive data from the applicant, to send the data to the financial institution, and to receive back the result. Why couldn't remote interface be construed just that way? Because the construction has to be supported by the specification. And certainly there is support for what you just recited. And in addition, there's a housing. In addition, there are all sorts of other things. Well, the housing is addition. And no one's arguing that the preferred embodiment of the housing is required. But what the academies are arguing here is that the whole disclosure of the 007 pattern has to do with setting up equipment at a convenient location, or maybe it's an inconvenient location. Or maybe more convenient than doing it at home. Because that's not what the 007 pattern talks about. There's nothing to suggest in that specification that a home application should be accepted. Everything, if you can read that specification, is kiosk, kiosk, kiosk. Sometimes the kiosk isn't mentioned. It's only the touch screen and the voice processing system that are discussed. But then how do we interpret that amendment that deleted kiosk from the claim, and replaced it with remote interface, and said a kiosk is not necessary? Because the kiosk, as Mr. Terranova says, is just the housing. So you could then take the dedicated equipment. It's a printer, and a fax machine, digital camera, whatever it is. And that would be covered if it's sitting on a desk or a counter. But that doesn't take it away from the fact that it's still the dedicated equipment for this purpose. One other thing I'd like to address is the Portis case, which DCI relies upon heavily. In that case, the holding was that the claims are not limited to the preferred embodiment. And we've just gone over it. Clearly, that's not what the district court's interpretation was here. Everyone agrees that the preferred embodiment is a kiosk. And that cabinet, which is a kiosk, is not required. The Portis case does not, as DCI argues, say that the claims can be interpreted so broadly as to cover embodiments which are no longer part of the specification. And here, in this case, we have that embodiment in the grandparent application of a personal computer and a modem only, or the agent's laptop only. And those embodiments were dropped. And now DCI is trying to read those claims broadly enough and says that Portis permits them to read the claims broadly enough to cover the embodiments that are no longer part of the specification. So I have no questions. OK. Thank you very much. Yes? May it please the court. I'd like to focus on two of the issues, verify and whether or not. The panelist's position in this court on verify is really rather remarkable. They contend that the trial judge improperly went beyond the first sentence of her claim construction and included language where she said that it does not exclude use of social security name address, plus some additional information that was more secure. The remarkable thing about that is that the opponents themselves asked Judge Kerry to define it as verify does not exclude use of name address social security number. That's found in the record of page 3689, note 12. That was in their claim construction chart. That was what they requested. They also urged Judge Kerry to reject our argument that it required biometric information. She did that. She rejected biometric information. She included the language they specifically asked for when she said that it does not exclude use of name address and social security number. What she did was to add to it something that is plainly evident from the specifications in the case. And that is that it has to have some information which is more secure than name address or social security number. Otherwise, there is no verification. There is only an identification. Now, we submit that under the doctrines of waiver, which this court has talked about in a number of cases, there has clearly been a waiver of the position asserted here in this court. They cannot go before the district court and ask for the inclusion of specific language and then come before this court and say the inclusion of that language was error. To permit such a variation in position from one court to another would violate the fundamental tenets of the invited error doctrine and wreak havoc, we suggest, in the relationships between the district court and the court of appeals. The significance of the waiver point is that if this court agrees with us that they've waived their argument in this court, then the verify instruction is correct. And there is no contention by the appellants that there is any disputed material fact that would preclude the summary judgment that was entered under the verify instruction that was given. So on that ground alone, the case should be affirmed. As I understand it, they're complaining about the additional gloss that they say was put on the verified invitation. Isn't that correct? That's correct. Part of which they asked for. It has to be something like mother's maiden name? Something more secure than name and address. Social security number. So how did they waive that complaint? Certainly they couldn't come in and say we didn't ask that it be construed to include social security number or address social security number. But they didn't ask for the additional point, did they? They didn't, but they accepted the additional point. Judge Perry specifically and unquivocally read her claim construction. And then she said, is there any objection? Mr. Terranova said, no, there was no objection. He then waived it on two other occasions. He filed a motion for reconsideration, challenging certain parts of the claim construction. He never made the challenge that he makes here in this court. And then at the summary judgment stage, similarly, they never challenged the claim construction. The ultimate claim construction is what's said with, I guess, page 3 of the order on claim construction, correct? That's correct. I mean, that's the ultimate claim construction. And that was precisely what she read at the mark of the hearing. And that's precisely what she asked, if you had any objection to it, and he said no. But that claim construction just simply says that it doesn't exclude certain information. It says it doesn't. Later on in the summary judgment, she, in effect, reconstituted, it seems to me, that limitation by requiring that additional information. Thanks, Judge Linn. As a matter of language and logic, what she said was, it does not exclude A plus B. The only way we submit that that could possibly have been interpreted was the way she did interpret it, which is, it does exclude A without B. And it's the B that's an issue here. That is, she found, and there's no dispute of fact on this, there was no additional, more secure information required by any of the attorneys, but particularly here by Ameritrade, beyond the less secure information of name, address, and social security number. And she explained why, if you just look at telephone number or if you just look at date of birth, that's not secure information because it's readily available from a picked up wallet. If I could move then to the whether or not issue. It's important here, I submit, to recognize that our argument rests on what the court told us in the Phillips case. It's the proper approach to claim construction. We're resting here on the specification itself and the totality of the specification. There are two critical parts in the specification that support our position that this has to be a binary system which either approves or disapproves entirely in an automated mode. And it cannot be a system which defers the consideration to human intervention. The parts of the specification are in column two at lines 42 through 45, where the spec defines closed loop by saying that all the steps involved are performed by a computer that is programmed to make the decision to approve or disapprove the request and to complete all aspects of it. The second part of the specification is in column four at lines 12 through 15, where it stresses that the invention avoids human intervention. It eliminates bias in the decision to approve or deny the application. Now, throughout the prosecution history, those points were stressed. Closed loop was repeatedly discussed in the prosecution history and always discussed consistently with what the spec in this patent said. Avoiding human intervention was stressed. The avoiding of any bias that comes from having a human being consider the application. And yet now they contend that their application, their patent, covers systems that do involve human intervention. The record is clear that in the Ameritrade situation, Ameritrade never rejects any applicant who applies through their website. They will either accept the applicant or they will defer the applicant to a human intervention process. And to encompass such human intervention within the scope of this invention lies directly in the face of the specification. Now, it's not just the specification that shows that their invention was limited to a totally automated system. The prosecution history is very clear. In the 721 specification, which is the HSBC case, the 721 specification in column 8, lines 22 through 24, includes a specific discussion that says, not every loan decision will be clear. In the event the analysis by the neural network 17 is inconclusive, the borrower will be called back and the time for the return call will be arranged. That inconclusive or indeterminate alternative was totally eliminated in the 707. And they went entirely into a situation in which the outcome had to be one way or the other. Now, this point was not reached in the summary judgment because Judge Curry disagreed with our construction. She said that it could have an indeterminate outcome. And because of her construction, it was not right for summary judgment. But in the interest of judicial economy, if the court does not affirm on the verified grounds, we submit that the court should consider and should change her plain construction on whether or not to reflect what this patent, in our view and specification, is entirely about. And that is a totally closed-loop system with a yes or no answer coming out of a computer. Professor, you just asked me that as far as your client is concerned, TD Ameritrade, correct, that it be affirmed simply on the verified ground? Well, we're resting on the other arguments. I don't know. We're not really using the remote interface as well. I'm using my time to address the verified argument. We just wanted to verify your argument. Perfectly appropriate. Judge Lynn, I wanted to address one point briefly that you raised. And this does get into the remote interface. And I think it's important here to recognize the facts of Ameritrade. Ameritrade did not see full summary judgment on remote interface under her definition. And the reason for that is that Ameritrade's customers could overwhelmingly apply for an Ameritrade account using their own personal computers from their own homes over the internet. But for a small period of time in a small number of Ameritrade branch offices, Ameritrade had in their branch offices computers. They were PCs, which were used to access the website over the internet. And therefore, we could not argue in summary judgment that dedicated supply by the institution didn't fit at least a small part of the Ameritrade situation. If you split the debate. Thank you. We appreciate your cooperation in addressing the arguments today. Mr. Sorensen. May it please the court. What we have here, Your Honors, is not only a lengthy prosecution history where the specification was amended and the claims were narrowed to exclude subject matter that was previously disclosed in a claim. But we also have a contrast between that course, that history, and another history of related applications where that was not done. As Judge Lynn observed, in the 721 patent, there was originally a disclosure of a personal computer as an interface to the system. That was deliberately, intentionally, completely deleted from the stream of applications that led to the patent that issued. This also applies to the alternative grounds for affirming the judgment that we've advanced, which are the claim terms automatic, without human intervention, without human assistance, and whether or not approved. They're all related and suggest, as Mr. Bass said, require that the claim system, this is not a method claim, it's a system, process all the applications it receives to an approval or rejection. The original application that was filed, that led ultimately to the patent in issue, as well as the 721 patent, contemplated a system that would allow some human intervention or assistance in the process in some cases. That is reflected in the claim language of the 721 patent, which is no longer at issue, which said the application of the process to approval or rejection or to an indeterminate stage that will require further processing by humans to complete. That language is not present in the claims that issue here in the 007 patent. That language was removed from the 007 patent. The specification is similar. The specification of the 007, or the 721 patent, says human intervention will not be required in most cases. It contemplates the possibility of an indeterminate result. That language was eliminated methodically and completely from the applications that led to the 007 patent. We also have the prosecution history that led to the 007 patent saying very clearly, and standing alone should be enough, but we have a contrast with a different application as well, that said that each application is processed. Each application is processed without human intervention. In a decision to transfer the funds or credit to the consumer is made without human intervention. All steps are performed without any human intervention. There's a contrast in the prosecution, and this is deliberate. Again, in the original, one of the apparent applications, the DCI had originally claimed a system without substantial human intervention. The examiner objected to that. The examiner thought that might be indefinite, and DCI removed that word substantial before the term requirement of no human intervention, and explained why. Applicant has removed this term to more particularly point out and distinctly claim that the approval of each loan and the decision to transfer the funds or credit to the consumer isn't made without human intervention. So we have a patent applicant who had different ideas at the beginning when he filed the patent application, but pursued different patents. He pursued a patent that led to a patent, it's not at issue here, that would allow the automated processing of some loan applications but not others. We had a separate path that led to the patented issue where the applicant removed all that language about human intervention and emphasized that we are going beyond what people have done in the army. People have used computers for a long time, but we are now going beyond that. We have an unprecedented level of automation, and that is a separate embodiment. That is what they have claimed in the patent suit, and it's different from what they claimed in the other patents that are not at issue. Thank you. Thank you. General, I have one question. How do you exactly say that the remote interface limitation is met in the federated system? Because the construction should be construed as computer equipment that allows an applicant to interact with the data processing system simply as the gentleman referred to, there is no requirement in the specification that it be supplied by a particular entity? No, I understand. How does the federated system work? Federated so that it meets the remote interface limitation. Oddly enough, federated is supplying the user interface. When you access a web page through the internet, you type in the address of federated websites by knocking on their door, and federated returns a web page of their user interface. Mr. Silfen says that federated customers access the system by home computers, and he said they also access it at the Macy's stores, but that's not accused here. I would contend that there's no way for them to know where it's being accessed from, because it's over the internet with a web address, and you don't know if they're at home, the applicant, or they're in a coffee shop or internet cafe. That's not really the essence of the invention. There's no way to know where they're located. Assume that all they do is access it from their homes. They would still infringe. You said they would still infringe. Absolutely, because there's no supply requirement, and all you're left with is a remote interface. I was going to address this in my rebuttal. They actually do supply something. They supply the user interface by providing the web page. They have programmers that design the web page, what fields are produced, what colors. That is actually coming from federated systems. That doesn't seem to be what we're talking about. It's not, and I agree that that should not be limiting the claim. I just simply want to inform you that, in fact, they don't supply the equipment, but they do supply part of the user interface, even though we do believe that should not be part of the construction. I'm just simply trying to clarify that they do supply. Mr. Silver said that you don't accuse them of meeting the claim limitation where somebody goes into a Macy's store and is purchasing an item, and at that time, when they seek to purchase the item, they apply for a card. We're not, because there's human intervention in verifying the identity, driver's license taken, and there's substantial human intervention in that process. But you're saying that they would infringe because of access at internet cafes, right? Yes, because they're not dealing with a human operator verifying the identity, taking driver's license, and that part of the process. When you go to an internet cafe, do you use your own computer or do you use a computer provided by the cafe? Either one. They can have wireless access or you take your laptop in or you can rent a computer. And you'd say they also infringe because of people accessing from their personal computers, either desk or laptop. That's correct. There's no distinction in the invention about that being relevant to how the operation of the invention works. And I wanted to turn to the whether or not approved, since that was fresh. Mr. Stoner read a statement that is absolutely correct from the prosecution history. He said it, or close about, the decision to approve and transfer the funds to complete the process are done without human intervention. This application is about approval. This is not about definitively rejecting. It's about can you apply, and if you are approved, it's a full, final and complete approval such that the process can be performed without human intervention to completion as the approval process. It's not about rejections or denials being computerized completely. That was the absolute essence of the 07 re-examination. That was in our arguments in our office action response and it was in the reasons that they allowed the case in the notice of intent to issue re-examination certificate. So our system is a processing system where the human intervention is not used to make the decision whether to approve it. They do that every single time. If every applicant is qualified according to their criteria, they would all be approved without human intervention. They absolutely produced that path. Our processing system and prosecution history was all about that because the prior art could not fully approve without human intervention or further processing. The Lockwood reference, the Jones reference, if you were pre-approved or thought you might be approved, they could not fully approve you. You had to go off to some other system. There had to be some other processing before the approval could be completed. There's absolutely nothing required in prosecution history about a definitive rejection being required to be provided. I mean, how could you provide a definitive rejection? You might be approved today, but your credit score might go up two weeks from now and you might be OK two weeks from now. That's just absolutely what the essence of the invention was. So all the statements, if you listen carefully to Mr. Stoner, all talk about the approval. That's exactly why it was allowed, and it's exactly why Mr. Milligan, the supervisor of the patent examiner, allowed the case under re-examination. I would also want to address the waiver issue real quickly. The only reason that we said that the construction of Verify does not include is because they were asking for it to include and be limited to name, address, and social security number. We were just trying to ask for the opposite of what they asked for. Saying something does not exclude doesn't mean that we're inconsistent. We said it's to confirm or substantiate an identity and it doesn't exclude this. That's not inconsistent. It just means that's not required. The only reason we did that is because we exchanged claim construction briefs, and they were asking for it specifically to be included first. You're saying, Mr. Turner, that it could include this, but it doesn't have to? Absolutely. And under the SanDisk case, there's no judicial stop there because we didn't prevail. And we have always taken the position to confirm or substantiate. We took it in Markman briefs. We took it at summary judgment decisions, and we're taking it here. We took it in the 2007 patent reexamination. We didn't urge on the construction necessary to file a judicial stop or a waiver. They're not prejudiced. They won the issue at summary judgment. I just don't see how that is a waiver. I think it would be very unfair for it to be held against us. Excuse me, but very difficult to understand claim language. When I heard the does not exclude at the Markman hearing, which she did verbally lie, handed out sheets, and I had to know right then and there whether I objected, which was kind of interesting. It was fun. But when I saw the does not exclude, you would think, whatever comes after that, this judge tended to like to put examples in her claim construction, and we told her that was very dangerous to do that. But when I saw the does not exclude, just like the is not limited to, I said, okay, fine. She was just trying to provide some clarification. I had no idea, and I don't think a reasonable person would have any idea that that was going to be interpreted in an inclusionary manner. I've got the remote interface very quickly. Again, the word dedicated is not used in terms of the specification. The word does not appear anywhere. And there is one statement in the specification that references your question about providing convenient places and malls and so forth or being provided by a financial institution. The statement about being provided by a convenient place says may. It's permissive language under the Allick case. Words like can or permissive. Secondly, there's one place that only one place, and this is where we're assuming the district court got her judged about the construction about the supply limitation. There's one place that says that if the financial institution provides the housing, the kiosk, it's more cost effective than providing a brick and mortar branch office. That's true. But that does not rise to the level of describing the whole scope of the invention. And it says provided. It doesn't say supply. It's a looser term that says, hey, if you want to provide the kiosk in lieu of the branch office, it's more cost effective. But that one statement in column two does not, in summary, does not say that it has to be done. It's just completely permissive. There's nothing that explicitly says that, but I would contend there's nothing that says it cannot be done. There's nothing that suggests that the whole scope of the invention would exclude that. And one of the ordinary skills, I mean, user interface is, I mean, I don't think that's a sufficient answer. Thank you. All rise. The court is now adjourned until this afternoon at 2 o'clock.